UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| STEPHEN B. WLODARZ, | ) | |
| --- | --- | --- |
| | ) | Case No. 3:22-cv-88 |
| *Petitioner*, | ) | |
| | ) | Judge Travis R. McDonough |
| v. | ) | |
| | ) | Magistrate Judge Debra C. Poplin |
| MIKE PARRIS, | ) | |
| | ) | |
| *Respondent*. | ) | |

# MEMORANDUM OPINION

Before the Court is Petitioner Stephen B. Wlodarz's pro se petition for habeas corpus relief pursuant to 28 U.S.C. § 2254 (Doc. 3). Respondent filed a motion to dismiss the petition as untimely (Doc. 20), and Petitioner responded in opposition (Doc. 22). After reviewing the parties' filings and the relevant state-court record, the Court has determined that the petition is untimely. Accordingly, Respondent's motion to dismiss (Doc. 20) will be **GRANTED**, Petitioner's § 2254 petition (Doc. 3) will be **DENIED**, and this action will be **DISMISSED WITH PREJUDICE**.

## I. RELEVANT BACKGROUND AND PROCEDURAL HISTORY

### A. State Proceedings

More than twenty years ago, Petitioner was the subject of a capital-murder prosecution in the Criminal Court of Hawkins County, Tennessee. The Tennessee Court of Criminal Appeals ("TCCA") has summarized the underlying facts as follows:

> [T]he record reflects that on July 13, 2000, police officers were dispatched to the scene of a home burglary on Short Road near Rogersville, Tennessee. When they arrived, a witness gave a description of the suspect, which matched the petitioner. Officers went to the petitioner's home and confronted him, and the petitioner

pulled out a shotgun and ordered the officers off his property. The officers left the scene; obtained arrest warrants against the petitioner for attempted aggravated burglary, vandalism, and two counts of aggravated assault; and returned to the petitioner's home. The petitioner barricaded himself inside, and a tactical unit was called. After several hours, the unit tried to force the petitioner out of his house by shooting tear gas canisters into it. During the melee, the victim was shot once in the head.

*Wlodarz v. State*, No. E2002-02798-CCA, 2003 WL 22868267, at *1 (Tenn. Crim. App. Dec. 3, 2003).

On September 18, 2001, Petitioner pleaded guilty pursuant to *North Carolina v. Alford*, 400 U.S. 25 (1970) to first-degree premeditated murder, attempted first-degree premeditated murder, two counts of aggravated assault, and one count of manufacturing a Schedule VI controlled substance. (Doc. 3-3, at 43.) That same day, the trial court sentenced him to an effective sentence of life without parole (*Id.*) Petitioner did not appeal.

On September 5, 2002, Petitioner filed a motion for post-conviction relief, asserting that his guilty pleas were not knowing and voluntary due to ineffective assistance of counsel. (Doc. 3-5, at 23.) Among other alleged deficiencies, he claimed that his trial counsel failed to adequately investigate and challenge the State's ballistics evidence (Doc. 18-33, at 1.) After a hearing on the matter, the post-conviction court denied relief (Doc. 18-3, at 6.) Petitioner appealed to the TCCA, which affirmed the judgment of the trial court. *Wlodarz*, 2003 WL 22868267, at *6. On May 17, 2004, the Tennessee Supreme Court ("TSC") denied Petitioner's application for permission to appeal. (Doc. 18-13.)

In September of 2004, Petitioner moved to reopen his post-conviction proceedings on the grounds that the State and his trial attorney allegedly suppressed bullets from his gun because they did not match the lead fragments recovered from the victim. (Doc. 18-14, at 1, 27.) The post-conviction court dismissed the motion, finding that Petitioner's unsupported allegations did

2

Case 3:22-cv-00088-TRM-DCP   Document 23   Filed 03/22/23   Page 2 of 12   PageID #: 2604

not qualify as new scientific evidence of his innocence. (Doc. 18-15, at 2.) The TCCA denied permission to appeal, as did the TSC. (Docs. 18-20, 18-21.)

In December of 2007, Petitioner filed a petition for writ of error coram nobis. (Doc. 18-22, at 4.) In the petition, he claimed that the State had deceived him into believing that Federal Bureau of Investigation ("FBI") ballistics testing had been performed, whereas no such testing occurred. (*Id.*) At a hearing on the matter, Petitioner acknowledged that the FBI had produced ballistics reports on March 19, 2001 and June 28, 2001, but claimed that he did not discover the reports until February 2008. (Doc. 18-23, at 61–62.) After hearing the evidence, the coram nobis court found that the FBI reports were not newly discovered and dismissed the petition. (Doc. 18-22, at 70.) The TCCA affirmed. *Wlodarz v. State*, No. E2008-02179-CCA, 2010 WL 1998766, at *5 (Tenn. Crim. App. May 19, 2010). Petitioner appealed to the TSC, which also affirmed.[1] *Wlodarz v. State*, 361 S.W.3d 490, 506–07 (Tenn. 2012).

In August of 2017, Petitioner filed a petition for writ of habeas corpus. (Doc. 19-1, at 4.) The habeas corpus court dismissed the petition as non-cognizable. (Doc. 19-4, at 9.) The TCCA affirmed. *Wlodarz v. Phillips*, No. E2017-02252-CCA, 2018 WL 4830429, at *4 (Tenn. Crim. App. Oct. 4, 2018). And the TSC denied Petitioner's request to appeal. (Doc. 19-15.)

Petitioner filed a second motion to reopen his post-conviction proceedings in June 2019. (Doc. 19-16, at 1.) As grounds for relief, he alleged that a June 28, 2001 Tennessee Bureau of Investigation ("TBI") microanalysis report—which analyzed Petitioner's clothing and window glass at the scene—was newly discovered evidence of his innocence. (*Id.* at 5–6.) The post-

---

[1] The TSC denied Petitioner's coram nobis petition on the merits, holding that a petitioner who pleaded guilty is eligible for coram nobis relief. *Wlodarz v. State*, 361 S.W.3d 490, 504 (Tenn. 2012). The court has now reversed that decision. *See Frazier v. State*, 495 S.W.3d 246, 247 (Tenn. 2016).

conviction court denied relief, finding that the microanalysis report was not newly discovered and was "not necessarily favorable to the defendant." (Doc. 19-25, at 14–15.) The TCCA denied Petitioner's application to appeal (Doc. 19-21, at 3), as did the TSC (Doc. 19-27).

### B. Federal Habeas Petition

On March 10, 2022, the Court received Petitioner's federal habeas petition (Doc. 3), in which he alleges that (1) he received ineffective assistance of counsel; (2) his plea was not knowing and voluntary; (3) his guilty pleas did not meet the requirements of *North Carolina v. Alford,* 400 U.S. 25 (1970); and (4) prosecutors and his attorney suppressed the June 28, 2001 microanalysis report. (Doc. 3, at 5, 8, 10; Doc. 3-3, at 56.)

Petitioner seems to acknowledge that his petition is untimely. (*See* Doc. 3, at 13–14.) However, he argues that his claims should be considered based on his actual innocence. (*Id.*; Doc. 3-2, at 1.) Respondent asserts that Petitioner has not established actual innocence and his petition should be dismissed as time-barred. (Docs. 20, 21.) As the Court will grant Respondent's motion to dismiss the petition as time-barred for the reasons set forth below, it will not reach the merits of Petitioner's claims.

## II. STATUTE OF LIMITATIONS

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") imposes a one-year statute of limitations for the filing of an application for a federal writ of habeas corpus. 28 U.S.C. § 2244(d)(1). Specifically, a petitioner has one year to file an application from the latest of:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or the laws of the United States is removed, if the applicant was prevented from filing by such State action;

> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

*Id.* The limitations period is statutorily tolled while a "properly filed application for State post-conviction or other collateral review" is pending. *Id.* § 2244(d)(2).

A court may consider an untimely § 2254 motion if the petitioner shows that he is entitled to equitable tolling of the limitations period or establishes a claim of actual innocence. *Holland v. Florida*, 560 U.S. 631, 649 (2010) (holding that § 2244(d) is subject to equitable tolling); *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013) (holding that a "credible showing of actual innocence" may overcome AEDPA's limitations period).

### III. ANALYSIS

#### A. Timeliness

Although Petitioner appears to concede that his petition is untimely, the Court will begin by addressing that issue. Petitioner's motion is governed by § 2244(d)(1)(A), which requires him to file his motion within a year of when his judgment became final. Because he was sentenced on September 18, 2001, and did not appeal, his conviction became final on October 18, 2001. *See State v. Green*, 106 S.W.3d 646, 650 (Tenn. 2003) ("[A] judgment of conviction entered upon a guilty plea becomes final thirty days after acceptance of the plea agreement and imposition of sentence."). The one-year window for filing a federal habeas petition began the following day. *See* Fed. R. Civ. P. 6(a) (providing "the day of the event" from which the designated period of time begins to run shall not be included).

5

The statute of limitations ran for 321 days until it was tolled on September 5, 2002, when Petitioner filed his state motion for post-conviction relief. The limitations period remained tolled while his post-conviction motion was pending and resumed on May 18, 2004, the day after the TSC denied permission to appeal. Petitioner's one-year federal limitations period expired forty-four days later, on July 1, 2004. Although Petitioner filed additional post-conviction motions in state court, those motions did not have any tolling effect, because they were filed after the limitations period had already expired. *Vroman v. Brigano*, 346 F.3d 598, 602 (6th Cir. 2003) ("The tolling provision does not . . . 'revive' the limitations period (i.e., restart the clock at zero); it can only serve to pause a clock that has not yet fully run.").

The Court did not receive Petitioner's § 2254 motion until March 10, 2022, seventeen years, eight months, and eight days after the limitations period ended.[2] Thus, Petitioner's federal habeas motion is clearly untimely. The Court cannot consider the merits of his claims unless Petitioner establishes that he is entitled to equitable tolling or the actual-innocence exception.

B.   **Equitable Tolling**

The Court finds no basis for equitable tolling. Equitable tolling is only appropriate if the petitioner shows "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Holland*, 560 U.S. at 649 (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)). Here, Petitioner claims that he "diligently pursued his actual innocence during years of his medical health problems." (Doc. 3-2, at 28.) He also makes a vague allegation of prosecutorial intimidation. (*Id.* at 25.) However, he has not shown how these alleged problems prevented him from filing his § 2254 motion

---

[2] Petitioner asserts that he submitted his § 2254 motion to jail staff for mailing on August 16, 2021 [Doc. 3-2 p. 25–26]. However, even if the Court were to find that Petitioner's motion was filed on that date, it is still more than seventeen years past the applicable AEDPA deadline.

during the past seventeen years. Indeed, he pursued several post-conviction challenges in state court during that time. Because Petitioner has not shown diligence or extraordinary circumstances, equitable tolling is not warranted.

C. **Actual-Innocence Exception**

A petitioner can overcome the AEDPA statute of limitations by showing that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *McQuiggin*, 69 U.S. at 403 (citations omitted). "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998) (citing *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992)). To satisfy this standard, a petitioner must produce "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). Alternatively, a petitioner who pleaded guilty must produce new reliable evidence that was not available when he entered his plea. *See Connolly v. Howes*, 304 F. App'x 412, 418 (6th Cir. 2008) ("Because all of this evidence was available to [the petitioner] when he pled [guilty] . . . and would have been available to him at trial, none of it is 'new.'" (citing *Souter v. Jones*, 395 F.3d 577, 590 (6th Cir. 2005))). "Evidence does not qualify as 'new' under the . . . actual-innocence standard if 'it was always within the reach of [petitioner's] personal knowledge or reasonable investigation.'" *Hancock v. Davis*, 906 F.3d 387, 390 (5th Cir. 2018) (citations omitted). Ultimately, relief is only warranted if the petitioner shows that "in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *McQuiggin,* 569 U.S. at 394–95 (2013) (quoting *Schlup*, 513 U.S. at 329) (internal quotation marks omitted).

Petitioner points to four kinds of evidence that he believes support his actual-innocence claim: (1) "new reliable exculpatory scientific evidence"; (2) "new reliable evidence consist[ing] of a psych. report"; (3) "critical physical evidence"; and (4) "trustworthy eyewitness accounts." (Doc. 3-2, at 5–7, 12.)[3]  However, none of this evidence is new.

### i.    *Scientific Evidence*

The record reflects that at least three ballistics tests were performed in this case.  In a May 21, 2001 firearm-identification report, the TBI found that bullet fragments recovered from the victim were too small to match to a particular firearm.  (Doc. 3-1, at 21–25.)  An FBI report from March 19, 2001, found that lead fragments recovered from the victim did not match an unfired cartridge in Petitioner's gun or a bullet apparently fired by law enforcement during the incident.  (*Id.* at 36–37.)  And an FBI report from June 28, 2001 found that a cartridge recovered from Petitioner's truck matched the lead composition of fragments from the victim.  (Doc. 18-24, at 100–01.)

Petitioner alleges that the March 19, 2001, FBI report is newly discovered evidence of his innocence.  (Doc. 3-1, at 34, 36–40.)  He claims that the report "surfaced" in a February 2008 fax from his trial attorney to his post-conviction attorney.  (Doc. 3-2, at 5.)

The state courts found that the March 19, 2001, FBI Report is not newly discovered, *Wlodarz*, 361 S.W.3d at 506, and is not proof of Petitioner's innocence.  *Wlodarz*, 2003 WL 228682672003, at *6.  Those findings are entitled to a presumption of correctness.  28 U.S.C. §

---

[3] Petitioner asserts that his new exculpatory evidence "consists of six (6) listed Exhibits and seventeen (17) attachments contained in [his] pro se motion to reopen his post-conviction." (Doc. 3-2, at 3.)  However, the Court notes that Petitioner has included the relevant evidence from his motion to re-open in the first attachment to the instant petition.  (Doc. 3-1.)  Therefore, where appropriate, the Court will cite to that first attachment.

2254(e)(1) (providing that in a federal habeas proceeding, a factual finding by a state court is presumed to be correct and the petitioner must rebut the presumption by clear and convincing evidence). However, even without such a presumption, the Court agrees with the state courts' findings.

The FBI report is clearly not new evidence, as shown by a July 24, 2001, defense motion and the post-conviction hearing testimony. The defense motion—which requested additional ballistics testing—noted that ballistics testing had been done and that it produced "no conclusive matches" between bullet fragments at the scene and those found in the victim. (Doc. 3-1, at 64.) The motion also specifically mentioned that "several fragments have been sent to the FBI." (*Id.*)[4] Moreover, at the post-conviction hearing, Petitioner's attorney testified that he received ballistics test results prior to Petitioner's pleas—although one may have come in afterward—and none of the tests conclusively showed where the bullet that struck the victim came from. (Doc. 18-2, at 78–79.) Petitioner's testimony at the post-conviction hearing likewise demonstrates his awareness of the inconclusive ballistics results. He testified that before pleading guilty, he discussed the importance of ballistics evidence with his attorney and knew that testing had been done. (Doc. 18-2, at 23–24.) Accordingly, the record shows that Petitioner knew ballistics testing had been inconclusive, and the defense could have raised that issue at trial.[5]

Even if the FBI report were "new," it does not establish Petitioner's innocence. The report merely found that the lead composition in an unfired cartridge in Petitioner's 30-30 gun did not match the lead composition of fragments recovered from the victim. (*See* Doc. 3-1, at

---

[4] The trial court granted the defense motion for further ballistics testing on June 27, 2001. (Doc. 18-22, at 15.) The results of that testing do not appear to be in the record before the court.

[5] The Court also notes that the March 19, 2001 FBI report was included on a list of discovery items that the prosecution provided to the defense in April 2001. (Doc. 19-2, at 151.)

36–40.) The report did not exclude Petitioner's gun as the murder weapon or implicate any of the officers at the scene. (*Id.*) Indeed, the FBI report from June 28, 2001, matched the lead composition of the fragments in the victim to a 30-30 cartridge in Petitioner's truck. (Doc. 18-24, at 100–02.) Furthermore, had Petitioner gone to trial, State witnesses would have testified that they saw two shots fired out of Petitioner's window, one of which struck the victim. (Doc. 18-2, at 72.) And Petitioner admitted that he fired two shots out of the window. (Doc. 19-16, at 22.) The evidence against Petitioner was, in the words of the trial court, "overwhelming" [Doc. 18-3, at 4.) Given these facts, Petitioner has not shown that no reasonable juror would have convicted him.[6]

### ii. *Psychological Report*

Petitioner has also submitted an excerpt from an April 2001 psychological report, alleging that it is "new reliable evidence" that "negate[s] [the] elements of premeditation, deliberation, and specific intent." (Doc. 3-2, at 7; *see* Doc. 3-1, at 42–43.) Petitioner claims that he received the report in June 2016 via a "Freedom of Information Act" request. (Doc. 3-2, at 7.) However, the report was prepared at the request of Petitioner's attorneys before he pleaded guilty. (Doc. 18-2, at 59.) Indeed, in June 2001, Petitioner's attorneys filed a notice with the trial court, stating their intent to use the report as evidence of "'diminished capacity,' duress or necessity, and self-defense." (Doc. 19-2, at 41–42.) Because the psychological report would

---

[6] The Court notes that, in his *Brady* claim, Petitioner asserts that the June 28, 2001, TBI microanalysis report was suppressed. (Doc. 3-4, at 52.) He does not appear to argue that this report is a basis for excusing the statute of limitations. In any event, such an argument would be without merit. As the state court pointed out, the microanalysis report appeared on a June 2001 list of outstanding discovery items and was completed shortly thereafter. (Doc. 19-25, at 14.) Because the report was available and could have been used at trial, it is not "new" for the purposes of the innocence exception.

10
Case 3:22-cv-00088-TRM-DCP   Document 23   Filed 03/22/23   Page 10 of 12   PageID #: 2612

have been available had Petitioner chosen to go to trial, it is not "new" for the purposes of the innocence exception.

### iii. Physical Evidence

Petitioner also claims that a collection of exhibits related to the crime-scene investigation constitutes "critical physical evidence" of his actual innocence. (Doc. 3-2, at 6; *see* Doc. 3-1, at 84–88, 93–95.) However, all of the evidence he cites would have been available at trial. Two of the exhibits—a case activity memo and affidavit—were produced by the defense investigator prior to Petitioner's plea. (Doc. 3-1, at 93–95.) The remainder of the exhibits—which include crime scene diagrams, officers' names and location at the scene, and a list officers' weapons— were named on the list of pretrial discovery items that the State provided to the defense. (*Id.* at 84–88; Doc. 19-2, at 151; Doc. 19-3, at 3–5.) Because this evidence is not new, it cannot serve as a basis for excusing Petitioner's untimely petition.

### iv. Eyewitness Accounts

Finally, Petitioner claims that his actual innocence is demonstrated by "trustworthy eyewitness accounts." (Doc. 3-2, at 12.) Specifically, he points to statements by neighbors involved in reporting the alleged burglary; two acquaintances who were present during his initial confrontation with law enforcement; and several officers who responded to the scene. (*Id.* at 12– 14; Doc. 3-1, at 2–4, 6, 10–17.) Again, the record shows that this evidence is not new. All of these witnesses were included on the State's witness list, and the defense was provided with their statements as part of discovery. (*See* Doc. 18-1, at 14; Doc. 19-3, at 3.) Moreover, these eyewitness accounts are not evidence of Petitioner's innocence. None of the civilian witnesses were present during Petitioner's standoff with law enforcement and, therefore, did not witness the murder. The officers were present during those events. However, their eyewitness

11
Case 3:22-cv-00088-TRM-DCP   Document 23   Filed 03/22/23   Page 11 of 12   PageID #: 2613

accounts—which point to Petitioner as being the one who shot the victim—provide evidence of his guilt, not his innocence.

In sum, Petitioner has provided no new evidence of his innocence. Thus, he cannot rely on the actual-innocence exception to excuse the untimely filing of his federal habeas petition.

## IV. CONCLUSION

Because Petitioner's federal habeas petition is time-barred and he is not entitled to equitable tolling or the actual innocence exception, Respondent's motion (Doc. 20) will be **GRANTED** and this federal habeas petition (Doc. 3) will be **DISMISSED WITH PREJUDICE.**

## V. CERTIFICATE OF APPEALABILITY

Finally, the Court must consider whether to issue a certificate of appealability ("COA") should Petitioner file a notice of appeal. A petitioner may appeal a final order in a § 2254 case only if he is issued a COA, and a COA will be issued only where the applicant has made a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c). Where a court dismisses a § 2254 petition on procedural grounds, a COA will issue upon a showing that reasonable jurists would debate whether a valid claim has been stated and whether the court's procedural ruling is correct. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). As reasonable jurists would not debate the Court's ruling that the § 2254 petition is time-barred, a COA will not issue.

The Court **CERTIFIES** that any appeal in this matter would not be taken in good faith. *See* 28 U.S.C. § 1915(a)(3).

**AN APPROPRIATE JUDGMENT ORDER WILL ENTER.**

/s/ *Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**